# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHRISTINE A. MICHAELS,** | Civ. No. 2:11-05657 (KM)(MCA) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **BJ'S WHOLESALE CLUB, INC.,** | |
| **Defendant.** | |

**MCNULTY, U.S.D.J.:**

This matter comes before the Court upon the motion of the Defendant, BJ's Wholesale Club, Inc. ("BJ's"), for summary judgment. Docket No. 37. The Plaintiff, Christine A. Michaels, commenced this action on September 29, 2011. Docket No. 1 ("Compl"). Of the Complaint's seven original claims, there remain three:  Retaliation in violation of the LAD (Count IV); Breach of contract (Count VI); and Breach of implied duty of good faith and fair dealing (Count VII). Compl. ¶¶ 224–260.[1] As to those three claims, I find that there is no genuine, material issue of fact for trial, and I award summary judgment in favor of the Defendant.

## I.    BACKGROUND

I consider the facts as stated in the Defendant's Statement of Undisputed Material Facts ("Def. SUMF") and Plaintiff's Responsive Statement of Material Facts ("Pl. RSMF") pursuant to L. Civ. R. 56.1. I consider as well the deposition transcripts and documentary exhibits submitted with the parties' summary judgment papers. Where the facts are not disputed, I assume them to be true; pertinent disputes are noted.

---

[1]    By stipulation, four other claims were dismissed with prejudice: violation of the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1, *et seq.* (Count I); hostile work environment in violation of the LAD (Count II); harassment in violation of the LAD (Count III); and wrongful discharge (Count V).

### A.  Plaintiff's Employment with BJ's

Michaels completed an application for employment with BJ's on July 23, 1991. Def. SUMF ¶ 1; Docket No. 37-4, Exhibit A ("Michaels Dep. Tr.") at 83. It included an "Applicant Statement," which stated that "I understand that my employment is for no definite or fixed period of time and that neither hours of work, which may be assigned to me at any time, nor any other act or circumstances shall constitute a guaranty of employment or as to daily or weekly straight time or overtime working hours, if any." Def. SUMF ¶ 2; Michaels Dep. Tr. at 84. Michaels signed the application below this statement. Docket No. 37-4, Exhibit B ("Employment Application"). At her deposition Michaels testified that she did not recall signing any contract of employment with BJ's. Def. SUMF ¶ 3; Michaels Dep. Tr. at 85:19–21.

BJ's Wholesale Club hired Michaels as an Assistant Manager in August 1991. Def. SUMF ¶ 4; Michaels Dep. Tr. 83, 86–88. She received several promotions, including one to General Manager and then to Regional Manager. As Regional Manager she supervised the operations of several BJ's Clubs in north and central New Jersey. Def. SUMF ¶¶ 5–6; Michaels Dep. Tr. at 87–89.

As Regional Manager, Michaels directly reported to supervisor Frank Buonvicino. Def. SUMF ¶ 7. When Plaintiff first became Regional Manager, Thomas Gallagher was Buonvicino's supervisor; when Gallagher was later promoted, Cornel Catuna became Buonvicino's supervisor. *Id.* ¶¶ 8–9.

### B.  BJ's Member Guide

BJ's maintains an employee handbook, the Club Team Member Guide, which is distributed to new employees. Def. SUMF ¶ 11; Docket No. 37-4, Exhibit E ("Member Guide"). The parties dispute whether Plaintiff first saw a copy of the Member Guide in the 1990s, or "around 2000." *see* Def. SUMF ¶ 12; Pl. RSMF ¶ 12. It is undisputed, however, that as General and Regional Manager, Michaels was familiar with the Member Guide and was responsible for enforcing its policies and procedures. The Guide includes a disclaimer stating that it does not constitute an employment contract or otherwise modify the at-will nature of a Team Member's relationship with BJ's. Def. SUMF ¶ 14.

The Member Guide sets forth BJ's[2] "Progressive Disciplinary Policy," which establishes three tiers of violations—Levels I, II, and III. Def. SUMF ¶¶ 18, 19; Member Guide at D-0878, D-0879, D-0881. Level III infractions may

---

[2]    I suppose that the possessive of BJ's is technically BJ's'—a hypercorrection that I will avoid.

2

result in immediate termination for the first offense. One of the explicitly enumerated violations under Level III is "possession, distribution, use, or being under the influence of illegal drugs or alcohol . . . on Company property at any time." Member Guide at D-0881.

### C. Michaels' Termination

On September 22, 2009, BJ's received an anonymous complaint to its ethics hotline that Michaels and other employees had consumed alcoholic beverages at BJ's East Rutherford, New Jersey club. That drinking incident allegedly occurred in the early morning hours of September 21, 2009, around the time of a merchandise inventory. Def. SUMF ¶ 29; Docket No 37-5, Exhibit H ("Ethics Hotline Complaint").

In accordance with standard procedure upon receiving an ethics hotline complaint, BJ's commenced an investigation. The investigation was conducted by Robin Bombardier and Robert Kirby. Def. SUMF ¶ 30–32. Michaels was interviewed and she admitted, orally and in writing, that she had consumed alcohol in the parking lot of the East Rutherford club. *Id.* ¶ 35. After completing their investigation, Bombardier and Kirby presented their findings to Gallagher, Catuna, and Susan Hoffman, BJ's Senior Vice President of Human Resources. *Id.* ¶¶ 38, 39. Those three decided to terminate Michaels' employment. *Id.* ¶ 40.

On September 30, 2009, Buonvicino and Bombardier met with Michaels to notify her that her employment with BJ's was terminated, based on the alcohol incident. Def. SUMF ¶ 49.

Another participant in the drinking incident, Charmine Sealey, was also fired. Michaels, a Regional Manager, and Sealey, the only member of the Asset Protection team present, were supervisory personnel responsible for enforcing company policies. Def. SUMF ¶¶ 47, 48; Docket No. 37-3, Exhibit F ("Hoffman Dep. Tr.") at 63–64. Other, lower-ranking personnel were punished, but less severely.[3]

Michaels maintains that her dismissal was pretextual. She says that the "inventory toast"— drinking on premises to celebrate the completion of a store's

---

[3]     In her certification, Michaels states that Buonvicino told her that the Loss Prevention Vice President wanted to fire Sealy, who is African-American, for poor job performance, but was worried that she might file a discrimination suit. Michaels Cert. ¶ 56. According to BJ's counsel, Sealy has not filed any claim of discrimination on her own behalf.

inventory—was a common practice. She claims that she was not the only person to be involved in such conduct and did not think it was inappropriate.[4]

It is undisputed that in August 2008, BJ's received a complaint that beer had been consumed at a company barbecue in the parking lot of a BJ's club in Paramus, New Jersey. Def. SUMF ¶ 24. (Unlike the inventory toast, this apparently occurred during regular hours.) That complaint was investigated by Hicks and Mauro Amato, the Regional Manager for the Paramus club. *Id.* ¶ 25. Their investigation confirmed that two supervisory employees had purchased and supplied the beer, and that on-premises drinking by employees had occurred. *Id.* ¶ 26. Pursuant to BJ's Team Member Guide, both supervisors were immediately discharged at the conclusion of the investigation. *Id.* ¶ 27. (The discipline, if any, applied to lower ranking employees does not appear in the record.) Michaels does not dispute that she learned of this incident around the time it occurred, Pl. RSMF ¶¶ 24–28, and therefore knew about it when she participated in the "inventory toast."

### D. Allegations of Discriminatory Conduct/Protected Activity

Michaels alleges that her supervisor, Cornel Catuna, discriminated against her. Her allegations center around a conference call in 2008 regarding the transfer of a BJ's General Manager, Debbie Vito; certain corporate meetings at which Catuna was present; and store visits Catuna made to Michaels' region. At all relevant times, Catuna was based at BJ's corporate headquarters in Natick, Massachusetts. Def. SUMF ¶ 10; Michaels Dep. Tr. at 129:12.

---

[4]     Michaels contends that the "inventory toast" was a company custom and that her direct supervisor, Buonvicino, had previously been involved in drinking activities on company property. Her allegations in this respect were general and devoid of supporting facts. *See* Michaels Cert. ¶ 41. Defendant acknowledges that the individuals who decided to fire Michaels were aware of allegations that Buonvicino knew employees had consumed alcohol on company property after inventories. Hoffman, one of the decision-makers, testified that past "inventory toasts" and Buonvicino's alleged knowledge of drinking incidents were not relevant to the decision to terminate Michaels. Def. SUMF ¶¶ 43, 45, 46. Buonvicino testified that he was not aware of employees' having consumed alcohol on company property to celebrate the completion of an inventory. Docket No. 37-4, Exhibit C ("Buonvicino Dep. Tr.") at 117–18.

Michaels saw Catuna at two of the four visits he made to New Jersey stores in her region. Michaels Dep. Tr. at 131:18–20. She testified that, during a November 2007 visit,[5] Catuna addressed her in a demeaning manner as if he were "schooling" her. Catuna also allegedly asked a female produce specialist questions that Michaels regarded as inappropriate because they were impossible for the produce specialist to answer. *Id.* at 159–61.

As Regional Manager, Michaels attended both annual and quarterly meetings. At the annual meetings, Michaels' interactions with Catuna were uneventful. Def. SUMF ¶ 57; Michaels Dep. Tr. at 131:21–132:25. As for quarterly meetings, Michaels recalled that Catuna attended seven or eight, but she remembered nothing of her interactions with him at the first four. Michaels Dep. Tr. at 130:19–22, 134-35. At a September 2008 quarterly meeting, Catuna "seemed very distant." Michaels noticed that he was "very formal" with her, but friendlier towards the "male regionals." *Id.* at 135. Catuna addressed male Regional Managers as "Mr.," while referring to female Regional Managers by their first names. *Id.* at 135-36. Michaels states that Catuna was dismissive towards her on various occasions. He did not commend her on the performance of the stores in her region, but did commend another Regional Manager. *Id.* at 142-43, 151-53, 155-56.

Michaels asserts that she also complained about Catuna's behavior toward a female general manager, Beverly Bongiorno. For instance, in September 2008, after Catuna visited several stores, including the store managed by Bongiorno, Catuna allegedly told Buonvicino that Bongiorno was "not too bright." Michaels Cert. ¶ 25. Buonvicino allegedly relayed this information to Michaels, who took offense. *Id.* ¶ 26. Following an August 2009 store visit, Bongiorno allegedly called Michaels and stated: "what it is about this guy [Catuna], does he just hate women?" *Id.* ¶¶ 31, 32. Michaels asserts that she complained about Catuna's conduct to both Buonvicino and Hicks. *See* Michaels Cert. ¶¶ 19, 21, 23, 26, 27, 33. Defendants deny that Michaels made any such complaint. Michaels acknowledges that she never complained about Catuna directly to any of the decision-makers, Hoffman, Gallagher or Catuna, and that she was never present when anyone else did so. Pl. Br. at 7.

---

[5]     Michaels maintains that she first complained about Catuna after this visit. Docket No. 43-1 ("Michaels Cert.") ¶ 21.

## II.    DISCUSSION

BJ's moves for summary judgment on the three un-dismissed counts of the Complaint: retaliation (Count IV), breach of contract (Count VI), and breach of implied duty of good faith and fair dealing (Count VII). Docket No. 37 ("Def. Br."). Michaels responds that she was terminated in retaliation for her complaints of discrimination against BJ's Senior Vice President Cornel Catuna. Michaels further contends that her termination for drinking alcohol on company premises was a pretext and a breach of BJ's contractual obligations to its employees.

For the reasons stated below, the motion for summary judgment will be granted.

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248; *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are

6

insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## B. LAD Retaliation Claim (Count IV)

Count IV of the Complaint alleges that the Defendants retaliated against Michaels for lodging complaints about Catuna's allegedly discriminatory conduct. Pursuant to N.J.S.A. 10:5-12d, it is unlawful to "take reprisals against any person because that person has opposed any practices or acts forbidden under" the New Jersey LAD.

Such an unlawful retaliation claim is properly analyzed under the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp v. Green*, 441 U.S. 792. *See Mancuso v. City of Atl. City*, 193 F. Supp. 2d 789, 811 (D.N.J. 2002) ("Analysis of LAD retaliation claims follows the now-familiar burden-shifting framework established for disparate treatment claims under Title VII and the LAD."). Under the *McDonnell Douglas* framework, the Plaintiff has the initial burden of establishing a prima facie case. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012). To state a *prima facie* case of retaliation under the LAD, plaintiffs must prove that: "(1) they engaged in a protected activity known by the employer; (2) thereafter their employer unlawfully retaliated against them; and (3) their participation in the protected activity caused the retaliation." *Craig v. Suburban Cablevision, Inc.*, 140 N.J. 623, 629-30, 660 A.2d 505, 508 (1995) (citing *Jamison v. Rockaway Township Bd. of Educ.*, 242 N.J. Super. 436, 445, 577 A.2d 177 (Sup. Ct. App. Div. 1990); *Wrighten v. Metropolitan Hosps., Inc.*, 726 F.2d 1346, 1354 (9th Cir. 1984)).[6] At the summary judgment stage, the plaintiff

---

[6]    There exists an equivalent, four-part formulation of the elements: "(1) that [plaintiff] engaged in protected activity; (2) the activity was known to the employer; (3) plaintiff suffered an adverse employment decision; and (4) there existed a causal link between the protected activity and the adverse employment action." *Young v. Hobart*

must point to evidence in the record sufficient to create a genuine factual dispute as to each of those three elements. *Lichtenstein*, 691 F.3d at 302 (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508–09 (3d Cir. 2009); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004)). If she is able to make this showing, the burden of production shifts to the employer to "articulate some legitimate, non-discriminatory reason" for its decision. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). Once the employer meets that fairly minimal burden, the plaintiff must point to some direct or circumstantial evidence from which a factfinder could "reasonably ... disbelieve [the employer's] articulated legitimate reasons." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)).

Michaels claims that BJ's stated reason for her terminating her—that she violated company policy by drinking on company property—was a pretext. She contends that the "inventory toast," drinking on company property after the completion of inventories, is a long-standing practice known and condoned by managers, including her direct supervisor, Frank Buonvicino. She submits that she was actually terminated in retaliation for complaints she made about Catuna's conduct toward her and other female employees.

### 1. *Prima facie* case of retaliation.[7]

Defendant BJ's argues, *inter alia*, that Michaels has failed to meet her prima facie burden because she (a) failed to establish that she engaged in protected activity; (b) failed to establish that the protected activity was known to the decision makers who fired her; and (c) failed to establish a causal link between the alleged protected activity and her termination. As to (b) and (c), I agree. Either standing alone would require summary judgment in favor of BJ's on the LAD retaliation claim.

#### a. *Plaintiff's engagement in protected activity*

A central element of a retaliation claim under the LAD is proof that the plaintiff engaged in a protected activity that was known to the alleged

---

*W. Grp.*, 385 N.J. Super. 448, 465, 897 A.2d 1063, 1072 (App. Div. 2005) (citing *Craig*, 140 N.J. at 629-30, 660 A.2d 505).

[7]    In its reply brief, Defendant argues that Michaels' Certification filed in opposition to summary judgment motion should be disregarded in its entirety under the "sham affidavit doctrine," which may apply where a certification directly contradicts prior sworn testimony. *See Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007). I discuss Michaels' Certification in the course of my analysis.

retaliator. *Erickson v. Marsh & McLennan Co., Inc.*, 117 N.J. 539, 560, 569 A.2d 793, 803 (1990) (quoting *Velantzas v. Colgate-Palmolive Co.*, 109 N.J. 189, 193 n. 1, 536 A.2d 237 (1988)). "Protected activity can include a plaintiff's complaints concerning allegations of discrimination against herself or others; however, complaints about unfair treatment do not suffice." *Fabrikant v. Arthur J. Gallagher & Co., Inc.*, A-5995-05T1, 2008 WL 281690, at *7 (N.J. Super. Ct. App. Div. Feb. 4, 2008) (citing *Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995)). BJ's denies that Michaels engaged in "protected activity" consisting of complaints concerning allegations of discrimination.

Michaels has submitted a certification to the effect that she complained about Catuna to Caroline Hicks and Frank Buonvicino "on at least two separate occasions." Pl. Br. (Docket No. 46) at 6; Michaels Cert. ¶¶ 17–35. *See also* Michaels Dep. Tr. at 143–44, 152–153, 161–62. In September 2008, she allegedly complained to both Hicks and Buonvicino about Catuna's comment to Buonvicino that Bongiorno, a female general manager, was "not too bright." Michaels Cert. ¶¶ 25, 26. According to Michaels, a few weeks later she followed up with Hicks, who told Michaels that, according to Candice Luther, Hoffman was in Catuna's "back pocket." *Id.* ¶ 28. The second complaint, in August 2009, arose from Catuna's site visit to a Watchung, New Jersey store managed by Bongiorno. According to Michaels, it was after this visit that Bongiorno called her and stated, in reference to Catuna, "what is it about this guy, does he just hate women?" *Id.* ¶¶ 31, 32. Michaels allegedly spoke to both Hicks and Buonvicino about this complaint. *Id.* ¶ 33.[8]

Hicks and Buonvicino deny under oath that they received any complaints, from Michaels or others, regarding Catuna's treatment of female

---

[8]     Plaintiff also submits that she complained to both Hicks and Buonvicino following a November 28, 2007 Watchung store visit. During that visit, Catuna allegedly treated Michaels in a "demeaning manner" and brought a female produce specialist to tears. Michaels concedes that, at that time of this incident, she did not complain that Catuna's behavior during the store visit was discriminatory. *Id.* ¶¶ 18–20. Michaels states that she again complained to both Hicks and Buonvicino after Catuna allegedly yelled at her during a conference call in early 2008 regarding the transfer of general manager. *Id.* ¶ 21. She complained that Catuna behaved in an unprofessional manner by scolding her. She did not, however, "focus on gender issues at that time." *Id.* ¶ 23. I take this as an admission that she did not then make a discrimination-related complaint that could be the foundation of a LAD retaliation claim.

employees. Def. SUMF ¶¶ 64–66.9 When asked if he remembered Michaels ever complaining about the way that Catuna treated female employees, Buonvicino said that the "only thing" he could recall was that Michaels relayed a comment made by another female manager who said something to the effect of "what is it with this guy, doesn't he like women?" Buonvicino Dep. Tr. at 79.

The merits of the underlying claim of gender discrimination as to Bongiorno are not directly at issue. The parties' submissions set forth a genuine dispute as to facts material to the issue of whether the plaintiff, Michaels, engaged in protected activity, *i.e.*, a complaint to superiors about alleged gender discrimination. That dispute is sufficient to defeat summary judgment as to the "protected activity" component of plaintiff's prima facie showing.

### b. *Decision-makers' knowledge of the protected activity*

Protected activity alone, however, is not sufficient. The protected activity must be "known by the alleged retaliator." *Erickson, Inc.*, 117 N.J. at 560, A.2d at 803 (quoting *Velantzas*, 109 N.J. at 193 n.1, 536 A.2d 237). As to this "knowledge" element, as to which the "nonmoving party [*i.e.*, Michaels] bears the burden of proof . . . the burden on the moving party [*i.e.*, BJ's] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. At that point, Michaels, as the non-moving party. "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Defendant argues that Plaintiff's prima facie case lacks substantial evidence that the alleged retaliator knew of any alleged protected activity, and that there is considerable evidence to the contrary.

The alleged protected activity consists of Michaels' complaints to Hicks and Buonvicino. It is undisputed, however, that Hicks and Buonvicino were not the "retaliators," *i.e.*, the decision makers with regard to Michaels's dismissal. The class of decision makers suggested by the evidence would consist of Susan Hoffman, Thomas Gallagher, and Catuna. Def. SUMF ¶¶ 41–42. The question, then, is whether Hoffman, Gallagher and Catuna, when they were deciding to dismiss Michaels, knew about Michaels' complaints to Hicks and Buonvicino.

---

9       BJ's also seems to be arguing that Plaintiff's voluntary dismissal of her discrimination and hostile work environment claims constitutes a concession that these complaints were not protected activity as a matter of law. I disagree.

Start with Hicks and Buonvicino. As noted above, they deny receiving the complaints at all, but Michaels swears she did complain to them, creating a factual issue that cannot be resolved on summary judgment.

Hicks and Buonvicino *also* deny ever relaying complaints to the pertinent decision-makers (Catuna, Gallagher, and Hoffman), to BJ's home office in Massachusetts, or indeed to any other person. *Id.* ¶¶ 64–66. As to this contention, there is no contrary evidence sufficient to create a triable issue of fact. Catuna and Hoffman testified that they were unaware of the alleged complaints at the time of the decision to terminate Plaintiff's employment. *Id.* ¶¶ 67–69; Docket No. 37-4, Exhibit D ("Catuna Dep. Tr.") at 47–48; Docket No. 37-4, Exhibit F ("Hoffman Dep. Tr.") at 57–58. Neither side submits any evidence from Gallagher.

Michaels admitted at her deposition that she was personally "not aware" that Catuna, Hoffman, or Gallagher ever learned of her alleged complaints to Hicks and Buonvicino. *Id.* ¶ 67; Michaels Dep. Tr. 193. Michaels acknowledges that she never complained directly to Hoffman, Gallagher or Catuna, and was never present when anyone else did so. Pl. Br. at 7. Her counsel conceded at oral argument that Michaels complained only to Hicks and Buonvicino.

It follows that Michaels' evidence, if any, that Catuna, Hoffman or Gallagher knew of her complaints must be indirect or circumstantial. Michaels submits that there is such circumstantial evidence that Buonvicino and Hicks actually communicated the complaints to the decision-makers and that the decision-makers' conduct suggests knowledge of her complaints. I here discuss five pieces of indirect evidence cited by Michaels:

1. Michaels states that she complained to Hicks about an alleged comment by Catuna in September 2008 that another BJ's female manager, Beverly Bongiorno, was "not too bright." Hicks assured Michaels that she would follow up with her superiors. Michaels Cert. ¶¶ 25–27. Hicks allegedly told Michaels that somebody (possibly Candice Luther, who was not a decision maker in Michaels' dismissal),[10] said that nothing would be done about her complaints because Hoffman was in Catuna's "back pocket." Michaels Cert. ¶¶ 24–28 said that nothing would be done because Hoffman was in Catuna's

---

[10]   It is not clear from Michaels' Certification whether she alleges that Luther is the person Hicks went to with the complaint, or whether Luther just offered her comments. There is no testimony from Luther in the record.

11

"back pocket." Michaels Cert. ¶¶ 24–28.[11] Hicks herself denies that any of this happened. But at any rate, I give little or no consideration to a contested secondhand account of what Luther said to Hicks about how Hoffman would treat a complaint about Catuna. Hearsay objections aside, this is not substantial evidence that Hicks actually relayed the alleged complaint to the relevant decisionmakers.

2. Michaels also points to general testimony by Hicks that she would always follow up with a superior regarding complaints of discriminatory conduct. Docket No. 43, Exhibit V ("Hicks Dep. Tr.") at 24–25. Michaels urges an inference that Hicks therefore must have relayed her complaints about Catuna to her superiors. This evidence of habitual practice is not particularly pertinent. Hicks denied ever receiving this particular complaint *at all.* SUMF ¶¶ 64–66. Her testimony that she would have forwarded a complaint she received cannot be so easily disentangled from its context, which is that she did not receive the complaint. Absent any other evidence that the complaint went up the line from Hicks, this is not sufficient to create a triable issue; at best it is fodder for cross-examination. The non-movant cannot defeat summary judgment simply by calling adverse witness liars; there must be some positive support for the non-movant's version of the facts. *Anderson*, 477 U.S. at 256-57 (internal citation omitted) (reasoning that "discredited testimony is not [normally] considered a sufficient basis for drawing a contrary conclusion" and that a "plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment . . . even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery").

3. Buonvicino allegedly told Michaels he would follow up with Catuna about the August 2009 incident. Michaels Cert. ¶ 34. Buonvicino denies ever doing so. *See* Buonvicino Dep. Tr. at 75–76. He did, however, state that he generally spoke to Catuna daily. Buonvicino Dep. Tr. at 17. From this, Michaels infers that Buonvicino must have told Catuna about the August 2009 complaint. General evidence that two people spoke is not specific enough to create a triable issue as to the content of their conversation; it is at best cross-examination material.

---

[11]   A colleague, Rafat Rhagib, testified that he remembered Michaels mentioning "comments about Sue Hoffman in Catuna's pocket." Docket No. 43, Exhibit W ("Rhagib Dep. Tr.") at 69. Hearsay objections aside, I give that no special independent weight. Michaels says something similar in her certification; at most this would rebut a charge of recent fabrication, if that were at issue.

4. Michaels alleges generally that her interactions with Catuna got "progressively worse" at each quarterly meeting in 2009. Cert. ¶¶ 29–30; Michaels Dep. Tr. at 155. Her specific factual answers, however, did not establish such a progression. At the March or April 2009 quarterly meetings, Michaels testified, Catuna treated her "[t]he same way" he had treated her at the January 2009 quarterly meeting. Michaels Dep. Tr. at 142–43, 155. At the July 2009 meeting, approximately two months before her firing, Catuna's interactions with her were "[j]ust more of the same." *Id.* at 156. Thus the conclusory "progressively worse" characterization in Michaels' Certification need not be credited, because it directly contradicts the underlying facts to which she testified. At any rate, the inference she urges is just too speculative to create a genuine factual issue. She describes some fairly routine irritants, typical of interpersonal relations (*e.g.,* that Catuna acted "distant" or "dismissive"), and posits that they prove some fairly specific historical facts. This evidence does not tend to prove the proposition that Catuna received or heard about her specific complaints.

5. Finally, Michaels submits that Catuna and Hoffman testified that they questioned Buonvicino about his knowledge of inventory toasts, contradicting what Buonvicino himself said.[12] Catuna Dep. Tr. at 42–43; Hoffman Dep. Tr. at 52. This evidence, says Michaels, precludes summary judgment because it calls into question the "credibility" of all of Defendant's evidence. It is not unusual that the persons investigating a drinking incident would ask about drinking incidents. And this evidence bears no relation to whether the decision makers knew about Michaels' complaints about discrimination. If every matter that could bear on "credibility" could be said to create an issue of material fact, then summary judgment would almost never be appropriate. Rule 56 requires that the court focus, not on general credibility, but on *bona fide* conflicts in the evidence as to the facts material to the causes of action.

As to the issue of the decision makers' knowledge, BJ's argues that this case is analogous to *Young v. Hobart W. Grp.,* 385 N.J. Super. 465, and I agree. There, the plaintiff brought a LAD retaliation claim, alleging that she was

---

[12]   Hoffman did testify that Gallagher, Catuna, and Hoffman called Buonvicino and that Buonvicino denied involvement in any inventory toasts. Hoffman Dep. Tr. at 51–52. Catuna testified that he asked Buonvicino about his knowledge of the East Rutherford drinking incident, and that Buonvicino denied having any knowledge of it. Catuna Dep. Tr. at 42–43. Buonvicino testified that none of the decision-makers ever spoke to him about this issue. Buonvicino Dep. Tr. at 156.

terminated because she complained about gender discrimination in the award of bonuses. The person to whom she allegedly complained denied ever receiving such a complaint, and also denied ever relaying such a complaint to the two persons who made the decision to terminate the plaintiff's employment. The plaintiff acknowledged that she never complained directly to those two decision makers. In upholding summary judgment in favor of the employer, the court concluded that there was "insufficient evidence that the activity was known to the employer." *Young*, 385 N.J. Super. at 466, 897 A.2d at 1073. Here, as in *Young*, Hicks and Buonvicino deny receiving a complaint from Michaels, and (logically) also deny relaying any such complaint to the decision makers, Hoffman, Gallagher, and Catuna. As in *Young,* the plaintiff, Michaels, acknowledges that she never directly raised her concerns with those decision makers. SUMF ¶ 67; Michaels Dep. Tr. at 193. And as in *Young,* summary judgment is appropriate because there is not sufficient evidence to create a triable issue of fact as to the decision makers' knowledge of the protected activity.

Michaels has not met her burden as to the second element of her prima facie case: that she engaged in protected activity which was known to the decision makers responsible for her dismissal. That is sufficient to require summary judgment in favor of BJ's as to the New Jersey LAD retaliation claim.

I nevertheless discuss the "adverse action" element briefly.

c. *Adverse employment action and causal link between protected activity and termination*

Michaels' termination, if retaliatory, would obviously be severe enough to constitute "adverse employment action." The more difficult question is whether Plaintiff has raised a genuine dispute as to the existence of a causal link between the protected activity and the termination. I find that she has not. That would constitute an independent basis for summary judgment in favor of BJ's.

As to causation, *post hoc* reasoning is insufficient as a matter of law. An adverse employment action may have *followed* protected activity; that does not prove that it *resulted* from the protected activity. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Plaintiffs commonly suggest that, because two events occurred very close in time, the necessary causal connection may be inferred. That argument must be approached with care.

14

The evidentiary value of temporal proximity depends on the stage of the *McDonnell Douglas* analysis. When, as here, the plaintiff is attempting to satisfy her *prima facie* burden on summary judgment, close temporal proximity can save the case from dismissal for lack of causation. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989). At this stage, after all, the court is only determining whether the employer may be required to explain itself. *See also Smith v. Allen Health Sys.*, 302 F.3d 827, 833 (8th Cir. 2002) (citation omitted) (stating that *McDonnell Douglas* "requires only a minimal showing before requiring the employer to explain its actions"); *James v. New York Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000) (finding that a plaintiff's burden on presenting a prima facie case under *McDonnell Douglas* is "minimal"). Even at this procedural stage, however, "only where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation." *Young*, 385 N.J. Super. at 467, 897 A.2d at 1073 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)). "Where the timing alone is not 'unusually suggestive,' the plaintiff must set forth other evidence to establish the causal link." *Id.*, 385 N.J. Super. at 467, 897 A.2d at 1073 (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000)).

BJ's contends that the temporal proximity between Michaels' alleged complaints and her termination, whether viewed in isolation or in the context of the other evidence, is not "unusually suggestive" of retaliation. *See Young*, 385 N.J. Super. at 467, 897 A.2d at 1073 (citation omitted). As discussed above, there is no substantial evidence that the relevant decision-makers were even aware of, let alone motivated by, Michaels's complaints. Def. Br. at 12. And other evidence, far from reinforcing the "temporal proximity" argument, tends to undercut it. Immediately preceding Michaels' termination was the anonymous Ethics Hotline call about drinking on the premises. That tip was immediately followed by an investigation, in which, *inter alia,* Michaels admitted the misconduct. Her dismissal, as well as that of a co-participant, followed immediately. Taken together, these facts are not so "suggestive" as to create a genuine issue as to Michaels' termination having been precipitated by her complaints, as opposed to her misconduct.

Michaels asserts that her escalating complaints caused Catuna's conduct towards her to grow "progressively worse," culminating in her dismissal. Michaels Dep. Tr. at 154. She testified that while she saw "hints" of how he treated her differently from men in 2008, the behavior became "blatant" and "obvious" in 2009. *Id.* But the facts themselves, as testified to by Michaels,

15

belie her characterization of them. Michaels testified that she first spoke to Caroline Hicks about allegedly discriminatory treatment either in September 2007, after Michaels' first store visit with Catuna, Michaels Dep. Tr. at 162, 167, or in early 2008, in connection with the proposed transfer of Deb Vito, Michaels Dep. at 166. Michaels says she complained to Hicks about Catuna on approximately four other occasions. In her Certification, she stated that she complained about the disparate treatment in September 2008 and August 2009. At oral argument, her counsel soft-pedaled the "progressive deterioration" theory, arguing instead that her August 2009 complaint precipitated her dismissal a month later. BJ's submits that there is nothing about the "vague timeline of alleged complaints, the first of which is claimed to have been made more than one and one-half years" prior to the termination, that a jury could find to be "unusually suggestive" evidence of causation.

I agree. This would be an independent, alternative reason to grant summary judgment in Defendant's favor on the New Jersey LAD claim.

### C. Contract Claims (Counts VI and VII)

Plaintiff's remaining claims are for breach of contract (Count VI) and breach of the implied covenant of good faith and fair dealing (Count VII). Compl. ¶¶ 251–60. In Count VI, Michaels alleges that BJ's breached its express contractual obligations when it terminated her. In Count VII, Michaels alleges that BJ's had a contractual relationship with her, and that an implied term of that contract was a "duty of good faith and fair dealing."

The breach, Michaels submits, consists in BJ's dismissing her for an activity that was not a violation of the company's policies or, "at least was a permitted exception to the company's policies." Pl Br. at 18. Further, the company failed "to take into consideration mitigating facts—such as the knowledge of, and participation in, inventory toasts by Ms. Michaels' supervisors . . . and Ms. Michaels eighteen years of exemplary service . . . as it was required to do in accord with its contractual obligations to Ms. Michaels, including its contractual obligations pertaining to the company's progressive discipline policy." *Id.*

There is no written employment contract as such; the contract at issue, alleges Michaels, consisted of "oral representations to all BJ's employees, through unwritten employment policies, and, starting in late 2000, though BJ's Team Member Guide." Pl. Br. at 19. She submits that the oral, unwritten, and written promises were all to the same effect. These included:

16

- BJ's commitment to treat its employees fairly and equitably;

- BJ's commitment to keep the promises it made to its employees;

- BJ's commitment to utilize progressive discipline, and to consider other actions besides termination if warranted (i.e., to consider mitigating facts), even for the highest levels of violations (Level III violations);

- BJ's utilization of an introductory period for new employees to determine if an employee is meeting expectations, which obviously suggested a different employment relationship after a successful completion of the introductory period; and

- BJ's Expectations Program, which the company noted ran both ways and included what an employee could expect from the company.

*Id.* Michaels cites to her Certification, in which she states that "all BJ's employees were constantly promised that we would be treated fairly, that BJ's would keep its promises, and that we had the protection of BJ's expectations and progressive discipline programs." Michaels Cert. ¶ 87; *see also* Docket No. 43, Exhibits HH, GG ("Interrogatories").

First, BJ's contends that Michaels' contract claims are preempted by the LAD. Second, it contends that the Club Team Member Guide precludes any finding that Plaintiff has a contractual right to only be dismissed "for cause." Instead, a disclaimer in the Guide clearly states that Michaels was an at-will employee. Third, BJ's contends that any oral representations allegedly made to Michaels were too vague to create a contractual obligation. I agree with the second and third contentions, and will grant summary judgment to BJ's on the contract claims.

### 1. Preemption by the LAD

"Where the factual predicates for the common law claims and the NJLAD claims are the same and the remedies sought are the same, the common law claims are barred." *Martinez v. Anselmi & Decicco, Inc.*, No. 09-CV-5277, 2009 WL 5206286, at *8 (D.N.J. Dec. 22, 2009). "Because of the broad availability of remedies under the NJLAD, both state and federal courts in New Jersey have frequently held that the NJLAD bars common law claims based on the same operative facts as underlie the NJLAD claim." *Everson v. JPMorgan Chase*

17

*Bank,* No. 12-CV-07288, 2013 WL 1934666, at *2 (D.N.J. May 8, 2013) (citations omitted).

Though it is not entirely clear from the face of the complaint, it appears that Plaintiff may be asserting her contract claims in the alternative. The NJ LAD claim having failed, *see supra,* I see no good reason to rule that it remains viable for the limited purpose of preempting the contract claims.

At any rate, Michaels does not allege that BJ's breach of contract consisted of retaliation; to that extent, the contract claims are distinguishable from the LAD claim. True, the underlying facts overlap: both are based on the drinking incident and the circumstances of the termination. I nevertheless find that the bases of the claims are sufficiently distinct to stave off a preemption claim.

On this ground, summary judgment is denied.

### 2. Contract Based on the Team Member Guide

A prerequisite to any contract cause of action is, of course, the existence of a contract. Plaintiff argues that the Team Member Guide, an employment manual, created an implied contract between BJ's and its employees. And that written contract allegedly incorporated by reference any and all oral representations that BJ's made. According to Michaels, the Guide is deemed to contain "all of the promises, commitments, and programs that had previously been presented by BJ's orally to its employees." Pl. Br. at 21.

BJ's maintains that a disclaimer prominently displayed on the first page of the Team Member Guide effectively precludes any claim that the Guide constitutes an enforceable contract between employer and employee. At any rate, BJ's argues, it did not violate the policies in the Guide when it terminated Michaels' employment. Michaels, it says, was an at-will employee who could be discharged for any reason or no reason at all, absent a violation of public policy.

### a. *The Team Member Guide Disclaimer*

"In New Jersey, an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine." *Witkowski v. Thomas J. Lipton, Inc.,* 136 N.J. 385, 397, 643 A.2d 546, 552 (1994) (citation omitted). "An employment relationship remains terminable at the will of either

an employer or employee, unless an agreement exists that provides otherwise." *Id.*[13]

There is good evidence that Michaels understood from the outset that her employment was at will. Before being hired, she signed an employment application that stated: "I understand that my employment is for no definite or fixed period of time and that neither hours of work which may be assigned to me at any time nor any other act or circumstances shall constitute a guarantee of employment . . . " SUMF ¶ 2; Michaels Dep. Tr. at 83; Employment Application. Michaels acknowledged that she completed and signed that employment application. SUMF ¶ 1; Michaels Dep. Tr. at 83; Employment Application at D-0068.

Of course, employment is not at-will if "an agreement exists that provides otherwise." *Witkowski,* 136 N.J. at 398, 643 A.2d at 533. Michaels, however, did not have a formal employment contract with BJ's. She acknowledged that she did not sign any such employment contract. SUMF ¶ 3; Michaels Dep. Tr. at 85.

A formal employment contract, though, is not the only kind of contract. The presumption that employment is at-will may be overcome "if a plaintiff can prove that an employment manual containing job-security and termination procedures could reasonably be understood by an employee to create binding duties and obligations between the employer and its employees." *Witkowski* 136 N.J. at 399, 643 A.2d at 533. In such a case, the employment manual is treated as the contract of employment. As explained in *Woolley v. Hoffmann-La Roche, Inc.,* under those circumstances "the manual will constitute, in effect, a unilateral offer to contract that an employee may accept through continued employment." *Witkowski,* at 399, 553 (citing *Woolley,* 99 N.J. 284, 309, 491 A.2d 1257, *modified,* 101 N.J. 10, 499 A.2d 515 (1985)). And such an employment-manual-based contract can be sufficient to "overcome the presumption that the employment is at will." *Id.*

In order to state a contract claim based on an employment manual (or other widely distributed policy), the plaintiff must point to a provision that contains "an express or implied promise concerning the terms and conditions

---

[13]     The employment-at-will doctrine is not without exceptions. For example, an employer cannot fire an employee for a discriminatory reason. *Id.,* 136 N.J. at 398, 643 A.2d at 533. The claim discussed here, however, is based on contract.

of employment." *Id.* at 393, 550 (quotations and citations omitted). Such a contract can only rest on the reasonable expectations of employees. *Id.* (citing *Woolley*). Factors affecting reasonable expectations include the comprehensiveness of the termination policy and the context of the manual's preparation and distribution. *Id.*

Employers, wary of creating contractual rights, have included disclaimers in their employment manuals. Such disclaimers may be effective. It is well established that an implied contract based on an employment manual may be negated by the inclusion of a "clear and prominent" disclaimer. *Id.* at 400, 554 (citing *Woolley*, 99 N.J. at 285); *see also Polonsky v. Verizon Communications Corp.*, No. 09-CV-4756, 2011 WL 5869585, at *9 (D.N.J. Nov. 22, 2011); *Nicosia v. Wakefern Food Corp.*, 136 N.J. 401, 643 A.2d 554, 559-60 (1994). An effective disclaimer must be "expressed in language such that no one could reasonably have thought [the manual] was intended to create legally binding obligations." *Nicosia*, 136 N.J. at 413, 643 A.2d at 560 (internal quotation omitted). "Such a disclaimer serves 'to provide adequate notice to an employee that she or he is employed only at will and is subject to termination without cause.'" *Armato v. AT & T Mobility LLC*, A-2754-11T2, 2013 WL 149671 (N.J. Super. Ct. App. Div. Jan. 15, 2013) (quoting *Nicosia*, 136 N.J. at 412).

The Team Member Guide contains such a disclaimer. On the first page following the Table of Contents, the Guide states:

> *This guide does not constitute an employment contract, guarantee a definite term of employment, or otherwise modify the at-will nature of our Team Members' relationship with the Company. The policies and information contained within the guide may be changed, without or without notice by the company, at any time.*

SUMF ¶ 14; Team Member Guide at D-0849 (*italics* in original).[14] BJ's maintains that the Court may rule on summary judgment that this disclaimer is effective as a matter of law. *See Warner v. Fed. Express Corp.*, 174 F. Supp. 2d 215, 228 (D.N.J. 2001) (citations omitted) ("When the language and

---

[14] Michaels testified that, as a General Manager and then a Regional Manager, she was familiar with Team Member Guide and indeed was responsible for enforcing the policies and procedures established therein. Michaels Dep. Tr. at 91–92, 97. She testified, however, that she did not read the manual "cover to cover." *Id.* at 97.

placement of a disclaimer is not disputed, as in this case, the sufficiency of the disclaimer can be decided as a matter of law.").[15]

First, the language of the disclaimer is clear. The disclaimer specifically states that the Guide "*does not constitute an employment contract, guarantee a definite term of employment, or otherwise modify the at-will nature of our Team Members' relationship with the Company.*" The disclaimer does not contain legalese or the kind of confusing language found to render a disclaimer ineffective in *Nicosia, supra.* And it clearly states that the Guide does not affect the "at-will nature" of an employee's relationship with BJ's.

Second, I find that the disclaimer is sufficiently prominent. "The 'prominence' requirement can be met in many ways. Basically, a disclaimer must be separated from or set off in a way to attract attention." *Nicosia*, 136 N.J. at 415, 643 A.2d at 561.

> For example, "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it." N.J.S.A. 12A:1-201(10) . . . . A reader's attention may be called by setting off the disclaimer with different type,

---

[15]     Two cases in this district have dealt with the very employment manual in question, albeit in somewhat indirect fashion.

In *Varney v. BJ's Wholesale Club, Inc.,* Judge Wigenton considered what appears to be precisely the disclaimer at issue here. Although the court deemed the plaintiff's breach of contract claim to have been abandoned, the court nevertheless reviewed the Defendant's submission. The court's "own independent analysis of the motion record yield[ed] no finding to the contrary or any inaccuracies in Defendant's proofs or proffered arguments." And those arguments included the contention that the disclaimer contained in the Guide met the requirements of *Woolley* and *Nicosia* and, that the Guide therefore did not constitute an implied contract. No. 07-CV-47, 2008 WL 2944650, at *1 (D.N.J. July 31, 2008); Docket No. 37-7, Exhibit V ("Varney Summary Judgment Motion").

In *Creamer v. BJ's Wholesale Club, Inc.*, Civil No. 05-1995 (MLC), Judge Cooper ruled orally on a motion for summary judgment. (*see id.,* Docket No. 16). That plaintiff brought a claim contending that the Team Member Guide gave rise to an employment contract and that BJ's breached this implied contract by terminating the plaintiff's employment. (Docket No. 16 at 14). Judge Cooper, granting summary judgment in favor of BJ's as to this claim, considered the disclaimers in both the employment application and the Member Guide. That plaintiff admitted that she understood the disclaimer in the application to mean that BJ's "could terminate her employment." *Id.* at 16.  Judge Cooper cited, but did not substantially analyze, the Team Member guide disclaimer. Referring to *Wooley* and *Nicosia, id.* at 14, Judge Cooper found that "there was no express or implied contract of employment created between the parties." *Id.* at 17. "Rather it was an at-will employment relationship terminable by either party at any time or without, and with or without cause." *Id.*

including bold, . . . , capitals, . . . , or italics, . . . . A disclaimer may be underlined or set off by a different color or border.

*Id.* (internal citations omitted).

This disclaimer is on the first page following the Table of Contents. It is set apart from the Equal Employment Opportunity statement, the only other item on the page. Further, the disclaimer appears in italics, a method of emphasis specifically enumerated in *Nicosia*. (And the italic type sets it off from the accompanying Equal Employment Opportunity statement, which is in regular typeface.)

I am cognizant that the disclaimer is not preceded by a heading. Nor does it appear in bold face type, although the italic font is reasonably eye-catching. It does not merit its own entry in the Table of Contents. Under *Woolley* and *Nicosia,* however, I need not find that a disclaimer is *optimally* prominent; it need only be *sufficiently* prominent.

I so find. The disclaimer is clear and prominent enough to constitute an effective disclaimer. And, there being no dispute about the content or appearance of the waiver, I can determine its adequacy on summary judgment. *See Pepe v. Rival Co.*, 85 F. Supp. 2d 349, 383 (D.N.J. 1999), *aff'd*, 254 F.3d 1078 (3d Cir. 2001) ("When there are no disputes regarding the language and placement of a disclaimer, the adequacy of a disclaimer is a question of law.").

There being an effective disclaimer, the Team Member Guide does not constitute a contract. It therefore cannot serve as the basis for a claim of breach of contract or breach of the implied covenant of good faith and fair dealing. *See Varrallo v. Hammond Inc.*, 94 F.3d 842, 848 (3d Cir. 1996) (citation omitted) ("Because neither handbook affected the status of Varrallo's employment, he remained an employee 'at will.' As a result, there was neither a term of discharge only 'for cause' nor a covenant of good faith and fair dealing between Varrallo and Hammond.").

As to the contract claims based on the Team Member Guide, I will grant BJ's motion for summary judgment.

### b. *Failure to Comply with the Expectations Program*

In the alternative, even setting aside the disclaimer, I could not find that the proofs create a triable issue as to Michaels' claim that BJ's breached its Progressive Discipline policy. The Progressive Discipline policy is one of three components of the Expectations Program, contained in the Team Member

Guide at D-0878. Those three components are Progressive Discipline, Workplace Guidelines, and the Open Door Policy.[16] *Id.*

The Progressive Discipline policy states that "a Team Member who commits a violation may go through several disciplinary steps, depending on the level, seriousness, and timing of the violation." *Id.* The Workplace Guidelines policy sets forth conduct that is "not acceptable and may result in corrective action." *Id.* at D-0879. Three levels of violations are defined: Level I, Level II, and Level III. There is no dispute that Michaels committed a specifically-enumerated Level III violation: "Possession, distribution, use, or being under the influence of illegal drugs or alcohol, or possession of weapons on Company property at any time." *Id.* at D-0881. Level III violations "may result in immediate termination of employment for the first offense, unless other action is warranted following an investigation." *Id.*

In *Armato v. AT&T Mobility LLC*, the court similarly considered a claim arising from an alleged failure to comply with a progressive disciplinary procedure. That plaintiff claimed that "he was terminated before receiving the benefit of the progressive disciplinary steps outlined in AT&T's employment manual." A-2754-11T2, 2013 WL 149671, at 3 (N.J. Super. Ct. App. Div. Jan. 15, 2013). In ruling that the plaintiff's claim was "without merit," the court reasoned as follows:

> The manual, however, does not provide for a mandatory graduated disciplinary process, especially with respect to management-level employees. Instead, the 'Management Disciplinary Process' section details that the company may use certain methods to improve 'unacceptable standards of conduct,' but it also states that 'certain acts will result in immediate suspension and/or termination.' AT & T retained discretion in carrying out any progressive disciplinary measures.

*Id.*

---

[16]    The Open Door Policy, which also falls under the Expectations Program umbrella, states that "Management's door is always open to help resolve work-related problems." The policy sets forth steps that employees should follow to address concerns, including speaking to an immediate manager, the area human resources manager, and then the zone vice president. Team Member Guide at D-0882–83. The Open Door Policy does not appear to be implicated here.

BJ's retained similar discretion in its Guidelines. The Progressive Discipline policy states that "a Team Member who commits a violation *may* go through several disciplinary steps, depending on the level, seriousness, and timing of the violation." (emphasis added). Stepwise discipline is not mandatory. And it is undisputed that Michaels committed a Level III offense and that, under the Workplace Guidelines, a Level III offense "may result in immediate termination of employment for the first offense, unless other action is warranted following an investigation."

After the hotline call, BJ's followed standard protocol and commenced such an investigation. SUMF ¶¶ 29–30. During that two-day process, the investigators interviewed and obtained written statements from eight persons who had been present at the drinking event and also interviewed Michaels. *Id.* ¶¶ 34, 35. Michaels was given the opportunity to make written and oral statements. She admitted to the Level III offense of drinking on the premises. *Id.* ¶ 35. Ultimately, Hoffman, Gallagher, and Catuna decided that it was appropriate to terminate Michaels. They also fired the only other person of supervisory rank that attended the "event."[17]

BJ's clearly had the discretion to do this; it would not have been a breach of its procedures, even if those procedures were contractually enforceable. The result—dismissal of an eighteen-year veteran employee based on a single incident—may seem harsh. I cannot, however, swap my business judgment for that of BJ's.

On this alternative ground, then, BJ's motion for summary judgment as to contractual breach will be granted.

### c.   *Contract claims based on oral promises*

Plaintiff maintains that promises were made to all BJ's employees throughout her tenure, particularly "by human resource department

---

[17]   In her certification, Michaels disputes that Charmine Sealey, the other supervisor present at the drinking incident, was terminated for her participation in the incident. In her Certification, Michaels states that "Mr. Buonvicino told me that the Loss Prevention VP wanted to fire Ms. Sealey, who is African American, for poor job performance but was worried that she might file a discrimination suit. The loss prevention VP was apparently thinking about trying to use the inventory toast as an excuse for firing Ms. Sealey." Michaels Cert. ¶ 56. This attempt to assert Ms. Sealey's rights (she has not made any claim of discrimination), based on speculation, does not create an issue of fact as to breach.

representatives as part of the company's anti-union organizing campaigns." Pl. Br. at 20. Plaintiff alleges that these promises include an undertaking that employees would be treated fairly, that the company would use progressive discipline, and that employees had the "same protections that they would have if they were represented by a union," *id.,* including a guarantee of dismissal only for "just cause."

Oral assurances of job security "may be enforceable by an employee where the terms and conditions of employment are clear and capable of judicial interpretation and an employee reasonably relies on them to his/her detriment." *Swider v. Ha-Lo Indus., Inc.,* 134 F. Supp. 2d 607, 617 (D.N.J. 2001) (citing *Shebar v. Sanyo Bus. Sys. Corp.,* 111 N.J. 276, 544 A.2d 377 (1988). Such assurances may be enforceable as a contract "if the intention of the parties to make such a contract is clearly, specifically and definitely expressed, and the intent of the parties may be ascertained from the oral agreement, the attendant circumstances and the presence of valuable consideration." *Id.* (citing *Obendorfer v. Gitano Group, Inc.,* 838 F. Supp. 950, 953 (D.N.J. 1993)).

Defendant's alleged promise to treat employees "fairly" is too vague and unspecific to support a claim that this dismissal for admitted on-premises drinking, in violation of a specific, explicit rule, was a breach of contract. Michaels testified that no BJ's employee ever explicated the meaning of "being treated fairly." Michaels Dep. Tr. at 407. To be enforceable, a contract "must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 435, 608 A.2d 280, 284 (1992) (quoting *West Caldwell v. Caldwell,* 26 N.J. 9, 24–25, 138 A.2d 402 (1958)). The term "fair treatment" is too vague to permit enforcement with respect to this incident. *See Monroe v. Host Marriot Servs. Corp.,* 999 F. Supp. 599, 606 (D.N.J. 1998) (holding that a company's "Guarantee of Fair Treatment" was "lacking in specificity and explicit terms regarding job security and termination policies and is therefore not an employment contract capable of being breached").

Plaintiff also contends that BJ's made oral promises to utilize progressive discipline and that BJ's promised that she could only be fired "for cause." First, Michaels does not even really allege that she was ever told she could only be fired for "just cause."[18] She testified that she did not "know if they said it per

---

[18]    The argument for a "just cause" standard based on BJ's desire to stave off union activity is difficult to fathom. It seems to require the court to hypothesize a

se, but that certainly was the message that I got in 18 years, that you couldn't be fired for no reason." Michaels Dep. Tr. at 290–291. She does not identify who gave her that implied "message," and she "did not recall" anybody ever telling her what conduct would constitute "just cause."   Ultimately, she testified that she thought it was defined in the "Team Member Guide." *Id.*

Oddly enough, then, the oral promises come back to the Team Member Guide. The Team Member Guide does not define "just cause." Instead, as detailed above, it sets forth precisely the disciplinary regime that was applied in this case, disclaims enforcement as a contract, and establishes the employee's at-will status.

As to the oral-statements component of Michaels' contract claims, I will grant summary judgment to BJ's.

### d.   *Implied covenant of good faith and fair dealing*

Finally, I will address Michaels' claim that BJ's breached the Implied Covenant of Good Faith and Fair Dealing. Under New Jersey law, the implied covenant of good faith and fair dealing is "contained in all contracts and mandates that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 253, 791 A.2d 1068, 1074 (N.J. Super. Ct. App. Div. 2002) (quoting *Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420, 690 A.2d 575 (1997); *Palisades Properties, Inc. v. Brunetti*, 44 N.J. 117, 130, 207 A.2d 522 (1965)). The covenant "requires that a contracting party act in good faith when exercising either discretion in performing its contractual obligations, . . . or its right to terminate . . . . Accordingly, it may occur that a party will be found to have breached the implied covenant even if the action complained of does not violate a 'pertinent express term.'" *Id.* at 258, 1076-77 (internal citations omitted).

A breach of this implied covenant presupposes the existence of a contract, whether express or implied. A party cannot breach an implied term of a contract if there was no contract in the first place. In the particular case of an at-will employee, "an implied contract must be found before the jury could find that the implied covenant of good faith and fair dealing had been

___

collective bargaining agreement, where none was ever reached. These oral assertions are an insufficient basis for that relief, assuming it is available at all.

breached." *Wade v. Kessler Inst.*, 172 N.J. 327, 345, 798 A.2d 1251, 1262 (2002) ("To the extent plaintiff contends that a breach of the implied covenant may arise absent an express or implied contract, that contention finds no support in our case law.") *See also Pepe*, 85 F. Supp. 2d at 390 ("The doctrine of good faith and fair dealing cannot, however, create rights or obligations in the absence of a valid contract.").

Having found that there is no express or implied contract, I will also grant summary judgment in favor of BJ's on Michaels' claim that it breached the implied covenant of good faith and fair dealing.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**. An appropriate order will be filed with this opinion.

**KEVIN MCNULTY**
**United States District Judge**

DATED: June 19, 2014

27